IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MONICA CLARK, et al.                  :

                                      :

    v.                                : Civil Action No. DKC 2005-0103

                                      :

CREATIVE HAIRDRESSERS, INC.,          :
et al.                                :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this discrimination case are: (1) Plaintiffs' motion for class certification (paper 31); (2) Defendants' motion to strike Exhibit H to Plaintiffs' class certification motion (paper 37); (3) Defendants' motion for summary judgment (paper 30); (4) Plaintiffs' motion for leave to file an amended complaint to join additional plaintiffs (paper 17); (5) Plaintiffs' motion for a preliminary injunction (paper 26); (6) Plaintiffs' objections to Magistrate Judge Connelly's Discovery Order (paper 56); and (7) Plaintiffs' motion to exceed ten depositions and forty hours of depositions (paper 51). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the court denies Plaintiffs' motion for class certification, denies Defendants' motion to strike Exhibit H, grants

Defendants' motion for summary judgment, and denies as moot Plaintiffs' remaining motions and objections.

## I.  Background

Hair Cuttery salons provide a wide variety of value-priced services, with no appointment necessary.  (Paper 38, at 2). Defendant Creative Hairdressers, Inc., owns and operates more than 800 Hair Cuttery salons in several states, and employs Hair Cuttery salon employees.[1]  Creative Hairdressers is a member of Defendant Ratner Companies, L.C., which trades as "Hair Cuttery." (Paper 10, at 1; Paper 11, at 2).  Ratner Companies provides management services to Creative Hairdressers, Inc.  For example, Ratner Companies employs Hair Cuttery district and regional leaders, and provides support functions such as human resources, accounting, training, and policy formulation. (Paper 31, ex. F, at 2).  Defendants' Rule 30(b)(6) deponent testified that the formalized policies and operations of Hair Cuttery salons are unified.  (Paper 31, ex. C, at 41).  Although lower-

---

[1] Defendants inconsistently report the exact number of Hair Cuttery salons.  *See* (paper 11)(admitting that Creative Hairdressers owns approximately 800 hair salons); (paper 38) (stating that Hair Cuttery has nearly 1,000 locations); (paper 31, ex. D., at 13) ("Defendant Creative Hairdressers, Inc., operates approximately 900 salons in several states.").

level Hair Cuttery employees, including assistant and general managers, are Creative Hairdresser employees, they report to Ratner-employed district and regional leaders. (Paper 31, ex. C, at 178). With regard to employee discipline, low-level disciplinary actions are generally handled by Creative Hairdresser employees at the local level but some lower level discipline and all "higher" level disciplinary actions such as terminations are handled "by or in conjunction with" Ratner management. (Paper 31, ex. F, at 2).

Plaintiffs assert claims against Defendants for violation of 42 U.S.C. § 1981, alleging that Defendants have a pattern and practice of discriminating against African-Americans, and that, because of their race, they were denied service, received delayed service, were charged a higher fee, or were otherwise treated unfairly when they visited multiple Hair Cuttery locations in Maryland and Virginia.[2] Allegations and testimony specific to the two named plaintiffs and each of the three unnamed plaintiffs are discussed below.

## A. Plaintiff Monica Clark

Plaintiff Monica Clark alleges in her complaint, and has testified to, the following facts. Ms. Clark contends she was

---

[2] The complaint also contains descriptions of alleged discrimination by three "unnamed" plaintiffs, one of whom alleges discriminatory treatment at a Delaware Hair Cuttery.

discriminated against on three occasions at three different Hair Cuttery locations in Maryland and Virginia.  First, in January 2004, Ms. Clark visited the Clinton, Maryland, Hair Cuttery and was overcharged for a standard Hair Cuttery service.  Ms. Clark states that when she complained about the overcharge, she was told that she was charged more because her hair was past her shoulders, a fact that she disputes.  Ms. Clark paid the extra fee and later called the store to complain of the overcharge; Ms. Clark states that the salon's manager defended the charge and told her there was nothing she could do.

In July 2004, Ms. Clark visited the Waldorf, Maryland, Hair Cuttery location, and states that upon entry she was ignored by the Hair Cuttery staff.  Ms. Clark contends she was forced to wait for service while a Caucasian customer who entered the salon after she did was immediately helped.  When a stylist gave Ms. Clark a wash and trim service, she did not, as Ms. Clark testifies is "customary," wash her hair multiple times or briefly blow dry her hair so that it was not significantly wet when she left the salon.  Following this visit, Ms. Clark called the Hair Cuttery complaint hotline to report the incident.  Ms. Clark was offered coupons for a free service and advised to visit a different Hair Cuttery location or, if she chose to return to the Waldorf store, that the "Hair Cuttery would

4

recommend a person who would be willing to wait on her so she would not encounter the same problem upon her return."

In October 2004, Ms. Clark visited the Potomac Yard Hair Cuttery in Alexandria, Virginia.  Upon entry, Ms. Clark asked for a wash, cut, and dry.  Ms. Clark contends that the stylist, an Asian man who had served her on a previous visit without incident, quoted her a price for the services requested that was more than the listed price and included a fee for straightening her hair, which Ms. Clark had not requested.  When Ms. Clark questioned the charge, Ms. Clark states the stylist asked her to point out any stylist who would perform the service for a lesser charge, refused to serve her, and then waited on a Caucasian man.  Ms. Clark complained to the manager, who then asked another stylist to serve Ms. Clark.  When that stylist waited on her, Ms. Clark maintains that the stylist was "noticeably angry" and pulled her hair "hard."  Ms. Clark states that she again called the Hair Cuttery hotline to complain, and although she was sent two additional coupons for free services and informed that someone would talk to the manager of the salon, the employee stated there was "not much they could do."

## B.  Plaintiff Leslie Mercer

Plaintiff Leslie Mercer alleges in her complaint, and has testified to, the following facts.  In August 2003, Ms. Mercer

entered the Reston, Virginia, Hair Cuttery with her daughter. Ms. Mercer entered her name into the salon's computer system and chose "other" when prompted to indicate what type of service she sought.   When asked by a stylist, later identified as "Vinh Bach," what service Ms. Mercer needed, Ms. Mercer indicated that she wanted a "roller set."[3]  Mr. Bach acknowledged the request and Ms. Mercer proceeded to the waiting area.  Ms. Mercer states that approximately ten minutes later, a second stylist approached Mr. Bach and the two discussed whether any stylist could serve her, though she concedes that the conversation between the two stylists was not in English and she did not understand what was said.  Ms. Mercer states that shortly after this conversation, Mr. Bach shouted at her that there was no one who could perform the service she requested because her hair type was "too difficult."  When asked what the comment meant, Mr. Bach did not respond.  After waiting an additional short time, Ms. Mercer left the salon without receiving service.  Ms. Mercer called the Hair Cuttery hotline later that day to complain about what happened.  The next morning a Hair Cuttery district leader called Ms. Mercer to investigate the incident,

---

[3] Ms. Mercer contends that a roller set is a basic styling procedure.  Defendants' 30(b)(6) deponent confirms this, although the witness states that sets using something other than "big rollers" may be considered speciality procedures.  (Paper 31, ex. C, at 230-231).

but Ms. Mercer refused to provide any information, except that she had decided to pursue legal action.

## C.  Unnamed Plaintiffs[4]

The complaint also details alleged discrimination of three unnamed female African-Americans who visited Hair Cuttery salons in Maryland, Virginia, and Delaware.  Unnamed Plaintiff 1 alleges seven instances of discriminatory treatment at the Pickett Shopping Center Hair Cuttery location in Fairfax, Virginia, between March 2003 and October 2004.  In every instance, Unnamed Plaintiff 1 claims she was required to wait while non-African-American customers who came into the salon after her were helped first.  On at least one occasion she left the salon without receiving service.

Unnamed Plaintiff 2 alleges that during January 2003 she visited the Bowie, Maryland, Hair Cuttery and after waiting for two hours while stylists served at least one Caucasian customer who entered the salon after her, she left without service.  Unnamed Plaintiff 2 also alleges that in May 2003 she visited a Hair Cuttery in Dover, Delaware, to have her hair styled but was told that no one could do her hair and to come back when a

---

[4] These plaintiffs are later identified in Plaintiff Leslie Mercer's responses to Defendants' interrogatories, (paper 31, ex. I, at 2), as Roberta Washington, Judy Benson, and Ruthas Kwalume.

stylist who did African-American hair was working. After complaining, she eventually received service.

Unnamed Plaintiff 3 alleges that she and a non-African-American friend entered the Hair Cuttery salon on Lee Highway in Arlington, Virginia, and requested a wash and a trim. She alleges that although her friend was helped immediately, she was refused service by three stylists, all of whom said they would not perform a wash and trim service on her; the stylist who had helped her friend eventually assisted her. Unnamed Plaintiff 3 claims that she complained to the store's manager, who refused to take any corrective action against the stylists who refused to serve her. Unnamed Plaintiff 3 also alleges that while she was in the salon, her African-American grandson entered and was ignored, although Hair Cuttery employees paid attention and gave a lollipop to a Caucasian child. When she called the Hair Cuttery hotline to complain about her experience, she claims she was offered a free service coupon and advised to go to a different Hair Cuttery salon.

**D. Requested Relief**

Plaintiffs seek relief in the form of: (a) compensatory damages for each Plaintiff in an amount to be determined at trial but no less than $200,000 per Plaintiff; (b) punitive damages in an amount to be determined at trial but no less than

$25,000,000; (c) injunctive and declaratory relief that would prohibit Defendants from refusing to serve or providing delayed service to African-American women, "passing over" African-American women in favor of other non-African-American customers, charging African-American women more for services, and mistreating or otherwise discriminating against African-American women; (d) attorneys' fees, expenses, and interest as allowed by law; and (e) any other relief this court deems just and proper.

## II.  Class Certification

Plaintiffs filed a motion seeking class certification pursuant to Fed.R.Civ.P. 23, requesting that they be certified as representatives of a class comprising all "African-American women who sought or attempted to seek services at Hair Cuttery salons and were either (1) denied service, (2) received delayed service, (3) were charged more for services than non-African-American customers, and/or 4) were otherwise mistreated by the Defendants, because they were African-American women." Plaintiffs do not specify any time frame for the alleged discriminatory treatment.

In order for Plaintiffs to bring a class action, Plaintiffs must meet all four requirements of Fed.R.Civ.P. 23(a), and at least one of the requirements of Fed.R.Civ.P. 23(b).  *Amchem*

*Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997).  The burden of establishing class status is on Plaintiffs, *Bullock v. Bd. of Educ. of Montgomery County*, 210 F.R.D. 556, 558 (D.Md. 2002), and "[t]he court has a duty to undertake a 'rigorous analysis'" to ensure that the requirements of class certification have been met.  *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 215 (D.Md. 1997) (citing *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982)).  A district court may not evaluate the merits of a plaintiff's case, but "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160.  As the Fourth Circuit has noted:

> If it were appropriate for a court simply to accept the allegations of a complaint at face value in making class action findings, every complaint asserting the requirements of Rule 23(a) or (b) would automatically lead to a certification order, frustrating the district court's responsibilities for taking a "close look" at relevant matters, *Amchem,* 521 U.S. at 615, 117 S.Ct. 2231, for conducting a "rigorous analysis" of such matters, *Falcon*, 457 U.S. at 161, 102 S.Ct. 2364, and for making "findings" that the requirements of Rule 23 have been satisfied . . . . "*It is appropriate to conduct controlled discovery into the 'merits,' limited to those aspects relevant to making the certification decision on an informed basis.*"

*Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004) (quoting Fed.R.Civ.P. 23 advisory committee's note to 2003 amendments) (emphasis in original).

The four requirements of Rule 23(a) are commonly referred to as numerosity, commonality, typicality, and adequacy of representation.  Plaintiffs fail to satisfy at least two of these requirements - commonality and typicality.  Because the court finds that Plaintiffs fail to establish the commonality and typicality requirements of Fed.R.Civ.P. 23(a), it need not reach whether Plaintiffs have met 23(a)'s numerosity and adequacy of representation elements, or whether Plaintiffs satisfy the requirements of Rule 23(b).  *See Talley v. ARINC, Inc.*, 222 F.R.D. 260, 266, n.3 (D.Md. 2004).

## A.  Commonality

Rule 23(a)(2) specifies that in order for class certification, there must be "questions of law or fact common to the class."[5]  As this court has noted, "[m]inor differences in

---

[5] In their opposition memorandum, Defendants assert that *Lienhart v. Dryvit Systems, Inc.*, 255 F.3d 138, 146 (4th Cir. 2001) provides the applicable and more stringent commonality standard.  *Id.* ("The common questions must be dispositive and over-shadow other issues.").  The standard articulated in *Lienhart,* however, was particular to 23(b)(3) class certifications.  Because Plaintiffs assert that certification is proper under both 23(b)(2) and 23(b)(3), the less onerous commonality definition articulated in *Hewlett* will be applied.

(continued...)

the underlying facts of individual class members' cases do not
defeat a showing of commonality where there are common questions
of law." *Hewlett*, 185

F.R.D. at 216.   In discrimination cases, however, conclusory
allegations, standing alone, are insufficient:

> The key to the commonality requirement in
> discrimination cases seems to be whether
> there is evidence of centralized
> decisionmaking. . . . Factual disparities
> within the class will not bar certification
> when there are supported allegations of a
> pervasive policy of discrimination, unless
> the factual situation of the representative
> plaintiff is particularly unique.
> Conversely, an absence of supported
> allegations by the plaintiff of centralized
> . . . decisionmaking or a showing of
> decentralization by the defendant may result
> in a denial or reversal of class
> certification.

*Id*. (citation and quotations omitted).   *See also Talley,* 222
F.R.D. at 266-67 ("Plaintiffs must submit reliable evidence of
a defined pattern or practice of discrimination that, if proven
true, would establish liability on the part of all [d]efendants
with respect to all class members.").

Plaintiffs fail to establish the commonality factor because
there are significant factual differences among the putative
class members and Plaintiffs provide no evidence of a unified

---

[5](...continued)

discriminatory policy or centralized discriminatory decision-making to support their allegations.  First, unlike in *Hewlett*, 185 F.R.D. at 217, where all putative class members received the same treatment - denial of *any* service - Plaintiffs' factual assertions widely vary, as the broad definition of the class that Plaintiffs seek to certify shows.  The proposed class includes African-American women who were allegedly treated in many different ways, including being denied service completely, being forced to wait and/or being passed over for Caucasian customers, being charged more for services than Caucasian customers, and being "otherwise mistreated" because they were African-American.[6]  There are, in fact, significant differences between the facts presented by the two named plaintiffs.  Ms. Clark does not state that she was denied services; she contends that she was overcharged and received delayed and unsatisfactory service.  In contrast, Ms. Mercer states that she was denied service completely.[7]  Moreover, the named Plaintiffs went to

---

[6] This "mistreatment" could encompass innumerable types of conduct.  For example, Ms. Clark states that although she received service, her hair was pulled "hard"; Unnamed Plaintiff 3 contends that she was discriminated against, in part, because her grandson failed to receive a lollipop.

[7] This difference is not minor.  Because Ms. Clark was never denied service she will need to make different legal arguments than those putative class members who were.  *See e.g., Baltimore-Clark v. Kinko's, Inc.*, 270 F.Supp.2d 695, 699-700

(continued...)

13

different salons, at different times, and interacted with different stylists and managers.[8]

Second, other than Plaintiffs' conclusory allegations, there is no evidence that Defendants had a unified policy of discrimination or centralized discriminatory decision-making. Instead, the evidence shows that Defendants had an express policy of nondiscrimination that is posted in every salon, and that Defendants provide extensive anti-discrimination training to all of their employees both during orientation and annually. (Paper 38, ex, E, deposition of Donnelle Cate, at 414-416). *See also Talley*, 222 F.R.D. at 267 (finding no evidence of centralized discriminatory decision-making where defendants

_____

[7](...continued)
(D.Md. 2003); *Gilyard v. Northlake Foods, Inc.*, 367 F.Supp.2d 1008, 1013-15 (E.D. Va. 2005).

[8]  The facts surrounding the alleged discrimination of the unnamed plaintiffs are likewise individualized and include refusal of service, delay in receiving service, and discriminatory treatment in the form of a failure to receive a lollipop.  Each of the unnamed plaintiffs visited different salons at different times and interacted with different Hair Cuttery employees.  In considering the claims of the additional parties that Plaintiffs seek to add (paper 17), the lack of commonality becomes even more apparent.  *Compare* (paper 31, ex. J, Declaration of Angel Anderson) (stating she was overcharged and dissatisfied with the service performed on daughter), *with* (paper 31, ex. J, declaration of Cynthia Dumas) (stating she was discriminated against because a stylist wore gloves when washing her hair and left her under the dryer for nearly two hours, she was told she would have to pay in advance for services, and she was denied service because no stylist was able to perform the services she required).

"introduced undisputed evidence to establish that the company adheres to a rigid set of policies and procedures . . . for compliance with discrimination laws . . .").  The training materials emphasize that a stylist's goal should be to become proficient in all types of services so that the stylist would "avoid offending someone or unintentionally discriminating against a client." (Paper 31, ex. G).[9]  Plaintiffs acknowledge that Defendants' policy gives the illusion that it is non-discriminatory (i.e., it is facially neutral), but argue that it in fact discriminates because there is no absolute requirement that all stylists be proficient in all speciality services, and these services are primarily used by African-American women.[10]  The result is that African-American women are adversely affected - they are denied or must wait for service because not all

_____

[9] Defendants' actions following reports of discrimination also support their nondiscrimination policy.  For example, the day after Ms. Mercer telephoned the complaint hotline, a District Manager called her to discuss the situation.  (Paper 31, ex. K, at 147); (Paper 38, ex. C., at 95-96).  Mr. Bach, the stylist who refused service to Ms. Mercer, was later terminated after refusing to provide service to another customer unless she paid an overcharged price.  (Paper 31, ex. D., at 4).  In addition, a district manager contacted Ms. Clark within a week after she sent an e-mail complaining of discrimination.  (Paper 38, ex. B, at 164).

[10] Plaintiffs make additional arguments in support of an alleged "policy" of discrimination in their opposition to Defendants' summary judgment motion.  As will be discussed later in this opinion, these arguments are likewise unsuccessful.

stylists are capable of helping them.  As this court has noted, however, a disparate impact theory of discrimination is not actionable under § 1981, and Plaintiffs fail to proffer any evidence to support a pattern or practice of intentional discrimination.  *Buchanan v. Consol. Stores Corp.*, 217 F.R.D. 178, 190 (D.Md. 2003) ("The critical element of a § 1981 claim is the showing of *intentional* discrimination, not merely that the defendant adopted a policy or practice that had a disparate impact upon minorities.") (emphasis in original).  Moreover, some of the treatment the putative class members complain of is completely unrelated to a stylist's ability to provide service (e.g., allegations of overcharging and rudeness), further torturing Plaintiffs' attempt at articulating a unified discriminatory policy and highlighting the lack of commonality among the putative class members.  Because Plaintiffs fail to demonstrate the existence of any pattern or practice of intentional discrimination that would tie the putative class members together, "what remains is an aggregation of individual discrimination claims that require - and deserve - individual adjudication."  *Talley*, 222 F.R.D. at 268.[11]

---

[11] The court need not address Defendants' further argument that the commonality factor cannot be met because different affirmative defenses can be asserted against the individual putative class members depending on their allegations (e.g.,
(continued...)

16

## B.  Typicality

Class certification requires that "the claims and defenses of the representative parties are typical of the claims and defenses of the class." Fed.R.Civ.P. 23(a)(3).  The typicality requirement, oft criticized as "redundant" to the commonality requirement, focuses on "whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Hewlett*, 185 F.R.D. at 217.  In *Hewlett,* this court held that a plaintiff's claim may factually differ and still be "typical" of class member claims, if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Id. (*quotations omitted).

Plaintiffs fail to establish the typicality requirement. The allegations of discrimination are individualized and factually distinct, and Plaintiffs have not shown that they arise from a unified practice or course of conduct.  In fact, as discussed, the contentions of the two named plaintiffs differ significantly - Ms. Clark was not denied service but service

---

[11](...continued)
defenses based on statutes of limitation).

denial is the sole basis of Ms. Mercer's claim. *See supra* note 9; *Talley*, 222 F.R.D. at 268 (finding the plaintiffs failed to establish typicality where they "aggregated several individual complaints that require individualized proof and give rise to individualized defenses"). Unlike in *Hewlett*, where the court found that typicality was established where the plaintiffs all suffered the same type of discrimination - refusal of service - the putative class members in this case allege diverse instances of discriminatory treatment that give rise to individualized defenses. For example, in Ms. Clark's case, Defendants argue that she fails to state a *prima facie* case of discrimination because in each instance she "fully obtained the contract sought" (paper 30, at 23); with regard to Ms. Mercer's claim, Defendants concede she was denied service but assert legitimate, non-race-based reasons for the denial (paper 30, at 25-26).

Moreover, assuming Plaintiffs established Defendants' liability, the nature of each putative class member's damages would be highly individualized, depending on the specific discriminatory treatment she received and the damages she incurred as a result (e.g., the type and amount of emotional distress each person suffered).[12] For example, Ms. Mercer states

---

[12] Although the court may avoid the issues of individualized
(continued...)

that she suffered unique distress because her daughter was
present and observed the discrimination; some putative class
members allege only one instance of discrimination although
others claim they were discriminated against on multiple
occasions. (Paper 38, ex. C, at 87). *See Broussard v. Meineke
Discount Muffler Shops, Inc.*, 155 F.3d 331, 342-43 (4th Cir.
1998) (stating that individualized damages claims are "not
easily amenable to class treatment"); *Doe v. Chao*, 306 F.3d 170,
183 (4th Cir. 2002) (finding the district court did not abuse its
discretion in declining to certify a class "on the ground that
emotional damages require too much individualized proof to
render the named representatives' claims typical of those of the
class"). In their reply, Plaintiffs state: "[R]esolution of
each class member's compensatory damages can be achieved
mechanically and without such highly individualized scrutiny."
(Paper 44, at 22). This court has noted however, that where the
nature of individual damages sought is "compensatory damages for
humiliation, emotional distress, etc.," it "points to a
predominance of individual issues." *Hewlett*, 185 F.R.D. at 220.

---

[12](...continued)
compensatory damages by ordering class certification only on the
issues of declaratory and injunctive relief and punitive
damages, *see Hewlett*, 185 F.R.D. 211, this bifurcation would not
resolve the overall lack of commonality and typicality that
permeate Plaintiffs' complaint.

19

As Plaintiffs indicate in their reply, they seek relief for individuals who have "suffered the humiliation and emotional devastation caused by discrimination." (Paper 44, at 15).

### III.  Motion to Strike Plaintiffs' Exhibit H

Plaintiffs attach as an exhibit to their motion for class certification, what they purport to be a call log of discrimination complaints against the Hair Cuttery between 1999 and 2004. (Paper 31, ex. H). Defendants argue that Exhibit H should be stricken because it "references conduct occurring and statements made during settlement negotiations" in another case against Defendants in which the plaintiff was represented by the current Plaintiffs' counsel, a case that was eventually settled. Defendants argue that Plaintiffs' use of Exhibit H is therefore improper pursuant to Fed.R.Evid. 408.   (Paper 37, at 4). Plaintiffs counter that although the prior case settled, the settlement agreement did not limit Plaintiffs' counsel's use of the documents produced, including Exhibit H, and "the document contains no evidence of an offer of valuable consideration to compromise a claim." (Paper 45, at 2).

Plaintiffs' motion for class certification would fail even if the court assumed that Exhibit H was genuine and Plaintiffs were not precluded from using it under Fed.R.Evid. 408, because Plaintiffs have not produced sufficient evidence to establish

the commonality and typicality elements of Rule 23(a).[13]   In examining just the first page of the telephone log, the diversity of the alleged discrimination is readily apparent. For example, one complaint pertains to a stylist making comments about too much "inter-racial breeding in Chicago," another alleges discrimination against Hispanics, and multiple cite reverse discrimination against Caucasians. (Paper 31, ex. H, at 1).   Moreover, some of the alleged discrimination appears to pertain to non-Hair Cuttery salons. *See* (Paper 31, ex. H, at 1) (referencing complaints against Bubbles, a separate Ratner salon).   Thus, an analysis of the call log would merely reinforce the court's finding that there are significant factual differences in the types of complaints that the Hair Cuttery receives.

## IV.  Motion for Summary Judgment

## A.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*,

---

[13] Defendants argue that the document has never been properly authenticated. (Paper 54, at 3).

477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1987).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of South Carolina v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Celotex Corp.*, 477 U.S. at 323.  Thus, on those issues on which the nonmoving party will have the burden of

proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

**B.   Section 1981**

Section 1981 provides that:

> (a) . . . All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . .

> (b) . . . [T]he term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981.   In cases brought pursuant to § 1981, where
there is not direct evidence of intentional discrimination, a
plaintiff may nevertheless proceed under the three-step, burden-
shifting scheme set forth by the Supreme Court in *McDonnell
Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  *Patterson
v. McLean Credit Union*, 491 U.S. 164, 185-87 (1989); *Williams v.
Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).

Under the *McDonnell Douglas* framework, the plaintiff first
must establish a *prima facie* case of discrimination.   *See
McDonnell Douglas Corp.*, 411 U.S. at 802.   Once a plaintiff
establishes a *prima facie* case of discrimination, the burden of
production shifts to the defendant to present a legitimate,
nondiscriminatory reason for the action.   *See Reeves v.
Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)
(citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248,
253 (1981)).   If the defendant succeeds in doing so, that will
rebut the presumption of discrimination raised by the
plaintiff's *prima facie* case.   *See Stokes v. Westinghouse
Savannah River Co.*, 206 F.3d 420, 429 (4th Cir. 2000) (citing
*Burdine*, 450 U.S. at 255 n.10).   The plaintiff then must "prove
by a preponderance of the evidence that the legitimate reasons
offered by the defendant were not its true reasons, but were a

pretext for discrimination." *Burdine*, 450 U.S. at 253.  In the end, "[t]he plaintiff always bears the ultimate burden of proving that the [defendant] intentionally discriminated against her." *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Burdine*, 450 U.S. at 253).

## C.  Analysis

Plaintiffs do not forecast any direct evidence of discrimination.  Hence, the case will proceed under the *McDonnell Douglas* burden-shifting scheme.  In *Williams*, the Fourth Circuit articulated the applicable *prima facie* test for a § 1981 claim brought in the context of purchasing goods or services:

> To establish a *prima facie* case of discrimination in a § 1981 cause of action relating to the purchase of goods or services, [a plaintiff] must establish that: (1) he is a member of a protected class; (2) he sought to enter into a contractual relationship with defendant; (3) he met the defendant's ordinary requirements to pay for and to receive goods or services ordinarily provided by the defendant to other similarly situated customers; and (4) he was denied the opportunity to contract for goods or services that was otherwise afforded to white customers.

*Williams*, 372 F.3d at 667.  Each Plaintiff can establish the first three requirements of a *prima facie* case. (Paper 39, at 2) ("Both parties agree that . . . the operative test of whether

a *prima facie* case exists is the test of *Williams v. Staples* .
. . under which the dispositive element here is the fourth
element . . . .") .  Defendants argue that neither Ms. Clark nor
Ms. Mercer can establish the fourth element of a *prima facie*
case.  As will be seen, though, they arguably can satisfy this
element with regard to some of their claims, but then cannot
rebut Defendants' legitimate nondiscriminatory reasons for the
alleged discriminatory treatment.

**1.  Plaintiff Monica Clark**

**a.  The Waldorf, Maryland, and Potomac Yard, Virginia, Visits**

On two of the occasions that Ms. Clark contends discrimination occurred, namely, the visits to the Waldorf, Maryland, and Potomac Yard, Virginia, Hair Cuttery stores, Ms. Clark received the service she asked for at the price she requested (i.e., the "listed price").  Ms. Clark contends she was discriminated against because of the service she received and the way she was treated during these visits.  For example, Ms. Clark states that she was ignored upon entry and passed over while another customer received service, she was not given the customary "multiple wash" or brief blow-dry so that her hair wasn't dripping wet when leaving the store, she was quoted a higher, incorrect price for services requested, and a stylist pulled her hair while brushing it.[14]

As this court has noted, in order to establish a § 1981 claim in a retail setting, a plaintiff must prove that the "*right* to contract has been impeded, thwarted, or deterred in

---

[14] Ms. Clark acknowledges that she does not know if the customer who was helped first had an appointment, requested a particular stylist, or was a regular customer.  Once Ms. Clark notified the employees that she had been there first and was waiting, she was immediately helped.  With regard to the stylist's failure to blow dry Ms. Clark's hair, Ms. Clark admits that she did not ask to have her hair blown dry and that an additional fee is charged for this service.

some way;" that the enjoyment of the contracting *experience* was impacted is not sufficient. *Baltimore-Clark v. Kinko's, Inc.*, 270 F.Supp.2d 695, 699 (D.Md. 2003) (emphasis added). *See also Arguello v. Conoco, Inc.*, 330 F.3d 355, 358-59 (5th Cir. 2003) (dismissing claim despite allegations of racist remarks and crude gestures because the plaintiff successfully completed the transaction); *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1118 (10th Cir. 2001) ("[T]here must have been interference with a contract beyond the mere expectation of being treated without discrimination while shopping."); *Morris v. Office Max, Inc.*, 89 F.3d 411, 414 (7th Cir. 1996) (dismissing § 1981 claim because plaintiffs failed to allege they lost a contractual interest where they completed a purchase, despite the regrettable treatment they received); *Bobbitt v. Rage Inc.*, 19 F.Supp.2d 512, 518 (W.D.N.C. 1998) (stating that slow service is not a sufficient basis for a § 1981 claim).   On these two occasions, Ms. Clark does not state that her *right* to contract was somehow impeded, but claims that her enjoyment of the contracting *experience* was impacted.  This is an insufficient ground on which to base a § 1981 claim in the retail setting.

Ms. Clark's reliance on *Gilyard v. Northlake Foods, Inc.*, 367 F.Supp.2d 1008 (E.D.Va. 2005), to support a § 1981 claim

where there is receipt of service is misplaced.  First, by its own terms, *Gilyard* applies to "restaurant services."[15]  *Id*. at 1014.  Second, the court in *Gilyard* noted: "In a given case, it is up to the court to determine precisely what services are at issue."  *Id*.  The *Gilyard* court went on to define the "services at issue" to include serving "edible food" and found that the plaintiffs experienced more than just rude or delayed service - they were served fly-infested, inedible food.  *Id*.  Hence, they were denied the right to make a contract for services.  Unlike the plaintiffs in *Gilyard*, Ms. Clark does not contend she was denied the right to contract for services.  Also, the services at issue in this case were for hair styling.  Moreover, Ms. Clark asked for and received hair styling services at the listed price on both occasions.  Slow service, rudeness, and failure to do what was "customary" but not contracted for, may constitute poor customer service but they are far from the facts in

---

[15] The court emphasized the uniqueness of the restaurant setting, stating that "restaurant contracts are for more than food, they are for a dining experience commensurate with the quality of the establishment attended." *Id*. at 1014. *See also Arguello*, 330 F.3d at 360 (stating that restaurant contexts are distinguishable because the contract "entitles the customer to benefits in addition to the meal purchased").

*Gilyard*, and thus are not sufficient to establish a § 1981 violation.[16]

## b.  The Clinton, Maryland, Visit

On one occasion, the visit to the Clinton, Maryland, Hair Cuttery, Ms. Clark received the service that she requested but claims that she was charged ten dollars more than the listed price because she is African-American.   A discriminatory overcharge may constitute the denial of a "term of a contractual relationship" and provide the basis for a § 1981 claim.   *See Arguello*, 330 F.3d at 361.   Ms. Clark has stated a *prima facie* case because she produces facts sufficient to establish the fourth element - Ms. Clark contends she was denied the same opportunity to contract for goods or services that was otherwise afforded to white customers because she had to pay more for services.

---

[16] This result comports with a recent unpublished decision in this district in a case against Defendant Creative Hairdressers that alleged very similar facts.   *Harris v. Creative Hairdressers, Inc.*, No. Civ. JFM-04-1992, 2005 WL 2138128, at *3 (D.Md. Sept. 2, 2005).   Judge Motz, relying upon this court's decision in *Baltimore-Clark*, 270 F.Supp.2d at 699-700, granted summary judgment for Creative Hairdressers because, even though the alleged discriminatory comments and the perception that the plaintiff was passed over may have "diminished her enjoyment of the contracting experience," the plaintiff received a shampoo and blow dry and therefore plaintiff's right to contract was not "impeded, thwarted, or deterred." (quotations omitted).   *Id*.

Because Ms. Clark has presented a *prima facie* case, the burden of production shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the overcharge. *McDonnell Douglas*, 411 U.S. at 802.  Defendants assert that Ms. Clark was charged the extra fee because the stylist believed that Ms. Clark's hair exceeded a certain length and the Hair Cuttery has a policy of charging more for a wash and set service performed on longer hair.[17]  Defendants have met their burden of production and therefore the "presumption of discrimination 'drops out of the picture.'"  *Reeves*, 530 U.S. at 143, quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-08 (1993).  Ms. Clark must then prove by a preponderance of the evidence that Defendants' proffered reason is not their true reason, but instead a pretext for discrimination.  *Burdine*, 450 U.S. at 253. In *Reeves*, the Supreme Court clarified the plaintiff's burden at this stage.  530 U.S. at 146-47.  The court stated:

> The factfinder's rejection of the [defendant's] legitimate nondiscriminatory reason for its action does not *compel* judgment for the plaintiff. [*Hicks*,] 509 U.S., at 511, 113 S.Ct. 2742.  The ultimate question is whether the [defendant]

---

[17] Defendants wrongly assert this reason as evidence that Ms. Clark fails to present a *prima facie* case.  Defendants' proffered reason for the overcharge is properly considered in determining whether they satisfy their burden of production under the *McDonnell Douglas* framework.

> intentionally discriminated, and proof that
> "the [defendant's] proffered reason is
> unpersuasive, or even obviously contrived,
> does not necessarily establish that the
> plaintiff's proffered reason . . . is
> correct." *Id*. at 524, 113 S.Ct. 2742.  In
> other words, "[i]t is not enough . . . to
> *disbelieve* the [defendant]; the factfinder
> must *believe* the plaintiff's explanation of
> intentional discrimination."  *Id*. at 519,
> 113 S.Ct. 2742.

*Reeves*, 530 U.S. at 146-47. (emphasis in original).  The court noted that in some cases it may be *permissible* to infer discrimination from the falsity of the defendant's reason.  *Id*. at 147.  In those cases, if a plaintiff produces evidence sufficient to establish a *prima facie* case and that the defendant's legitimate nondiscriminatory reason is false, the plaintiff may not be *required* to present additional evidence of discrimination in order to withstand summary judgment.  *See id*. The court nevertheless emphasized that this sort of showing by a plaintiff *may not always* be adequate.  The court stated: "Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id*. at 148.

Ms. Clark contends that her hair was not long enough to justify the extra fee.[18]  Accepting this contention as true, which the court must do for purposes of this motion, Ms. Clark has still not produced sufficient evidence in rebuttal.   Ms. Clark does not present any evidence that Defendants' proffered reason was anything more than a mistake of fact (i.e., there is no evidence that the stylist did not actually believe Ms. Clark's hair was past her shoulders), or that the real reason for the overcharge was because of her race.[19]  *See Price v. Thompson*, 380 F.3d 209, 215, n.1 (4th Cir. 2004) (noting that "mere mistakes of fact are not evidence of unlawful discrimination"); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio,*

---

[18] In the complaint, Ms. Clark also alleges that Hair Cuttery's policy is to charge the extra fee only for chemical services, which she did not request on the occasion in question. This argument was not renewed in Plaintiffs' opposition memorandum (paper 36), nor does Ms. Clark offer testimony or other evidence in support.  All evidence on the record regarding the long hair fee shows that it *is* charged for a "wash and set," the service that Ms. Clark received during the Clinton Hair Cuttery visit. *See* (paper 30, ex. 2, deposition of Tonia Patt, at 242-46; ex. 3, deposition of Donnelle Cate, at 311-12 and price list attached to Cate deposition).   Ms. Clark's allegation, without more, is not sufficient to rebut Defendant's non-discriminatory reason. *Burdine*, 450 U.S. at 253.

[19] Ms. Clark asserts that Defendants' pattern and practice of discrimination is evidence that the overcharge was racially motivated.   Because Plaintiffs have not produced evidence sufficient to establish a pattern and practice, this argument fails.

*Inc.*, 53 F.3d 55, 62 (4th Cir. 1995), quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2nd Cir. 1985) ("'The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.'").  *See also Reeves*, 530 U.S. at 141 (stating that the plaintiff must show that the protected trait "actually motivated" the defendant's action). For these reasons, the court will grant summary judgment to Defendants on Ms. Clark's claims.

## 2.  Plaintiff Leslie Mercer

Unlike Ms. Clark, Plaintiff Leslie Mercer has produced evidence that she was denied the opportunity to receive hair services during her visit to the Reston, Virginia, Hair Cuttery. Ms. Mercer testifies that, upon asking for a "roller set," a Hair Cuttery stylist, Mr. Bach, told her that no one could help her because her hair was "too difficult to do."  Ms. Mercer subsequently left the store without receiving service.  Hence, Ms. Mercer produces evidence sufficient to establish a *prima facie* case of discrimination because she was denied the opportunity to contract that was otherwise afforded to Caucasian customers.[20]

---

[20] Ms. Mercer states that there were Caucasian customers in the Hair Cuttery at the time of her visit and that they were not denied service.

Because Ms. Mercer establishes a *prima facie* case, the burden of production shifts to Defendants to put forth a legitimate nondiscriminatory reason for the denial of service. Defendants offer multiple nondiscriminatory reasons: (a) Mr. Bach believed that it was another stylist's turn to provide service, and that stylist had left the store; (b) Mr. Bach perceived Ms. Mercer's hair as being difficult to do and felt he could not competently perform the requested service; (c) Mr. Bach was uncomfortable performing the service Ms. Mercer requested; and (d) Mr. Bach had poor customer service skills and was generally rude to customers.[21]   (Paper 30, at 25-26).   Ms. Mercer fails to proffer any evidence to show that Defendants' reasons are false, let alone a pretext for discrimination. *See Grenoba v. Montgomery County Dep't of Health & Human Servs.*, 209 F.Supp.2d 572, 578 (D.Md. 2002) ("At the very least, *Reeves* . . . demands that the plaintiff prove falsity in some way.").

The evidence supports Defendants' proffered non-discriminatory reasons.   Another stylist working at the time of Ms. Mercer's visit confirmed to a Hair Cuttery district manager investigating the incident that it was not Mr. Bach's "turn" to

---

[21] Defendants wrongly argue Ms. Mercer cannot state a *prima facie* case.   Defendants' reasons are properly considered in determining whether they satisfy their burden of production under the *McDonnell Douglas* framework.

take a customer.  (Paper 30, ex. 5, Deposition of Cathy Hall, at 91-92).  Moreover, Ms. Mercer concedes that there is no such thing as "African-American hair" and anyone can have any type of hair, and that on a previous visit to the Bowie, Maryland, Hair Cuttery, she believes that some stylists were hesitant to do her hair in particular, but not "African-American" hair generally. (Paper 30, ex. 8, Deposition of Leslie Mercer, at 75-78).  In addition, there is evidence that Mr. Bach refused to perform services on more than one occasion and was uncomfortable performing the service the Ms. Mercer requested, even though it was a basic service.  (Paper 30, ex. 5, Deposition of Cathy Hall, at 183) (stating that Mr. Bach told the district leader on a number of occasions that he was not comfortable performing "roller sets").[22]

Ms. Mercer states that "any reason Defendants proffer to explain why [she] was denied service is mere pretext, particularly in light of the number of other African-American

---

[22] Mr. Bach was put on probation after the incident with Ms. Mercer and was subsequently fired after another incident where he refused to perform a coloring service on a customer unless she would pay more than the listed price.  Although Defendants allege that this customer was Caucasian, citing to Cathy Hall's Deposition at 19-25 in support, Defendants fail to attach all of these pages.  (Paper 30, ex. 5).  In addition, in Defendants' responses to Plaintiffs' first set of interrogatories, Defendants stated the race of the customer was unknown.  (Paper 23, ex. B, at 12).

customers who have complained of similar mistreatment." (Paper 36, at 18).  By referencing these other allegations, Ms. Mercer implies that Defendants have a pattern and practice of discrimination and that this can be used to show that any reason Defendants offer would be pretextual.  Because Plaintiffs have not proffered evidence sufficient to establish a pattern and practice, Ms. Mercer's argument fails.  What remains is a general and unsupported assertion that *any* reason Defendants offer to explain the service denial is pretextual.  This is insufficient to withstand summary judgment.  *See Detrick*, 108 F.3d at 536 ("A mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment.").

**3.  Use of Pattern or Practice Evidence to Prove Pretext**

Evidence of a pattern or practice of discrimination may be used to help prove claims of individual discrimination under the *McDonnell Douglas* framework.  *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 760-61 (4th Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999).  Pattern and practice evidence could be used to show that Defendants' legitimate nondiscriminatory reasons were pretextual.[23]  *See id* at 761.

---

[23]  Because both Plaintiffs establish *prima facie* cases of
(continued...)

("Evidence of a pattern or practice of discrimination may very well be useful and relevant to prove . . . that the [defendant's] articulated reasons for the . . . action was merely pretext . . . .") (internal citation omitted).

Although its use would be permissible, Plaintiffs fail to come forward with evidence sufficient to establish the existence of a pattern or practice of discrimination. In order to establish a pattern or practice, a party must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. It [has] to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure[,] the regular rather than the unusual practice." *Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 336 (1977). *See also Stastny v. S. Bell Tel. & Tel. Co.*, 628 F.2d 267, 273 (4th Cir. 1980) (stating the standard operating procedure must "so demonstrably treat[] women in relatively unfavorable ways that it justifies a rebuttable inference that it proceeds from an intention to treat them differently simply because of their sex"); *Janey v. N. Hess*

---

[23](...continued)
discrimination based on the factual circumstances surrounding some of their individual visits to the Hair Cuttery, the use of pattern and practice evidence to establish a *prima facie* case is unnecessary. For the other visits, the claims fail for reasons unrelated to discriminatory animus.

*Sons, Inc.*, 268 F.Supp.2d 616, 626 (D.Md. 2003) ("Plaintiff is required not merely to allege . . . a pattern or practice case, but to offer statistical evidence and anecdotal testimony to demonstrate that widespread discrimination exists.").

Although Plaintiffs raise several arguments positing that a pattern and practice of racial discrimination exists, Plaintiffs do not present sufficient evidence of an intentionally discriminatory standard operating procedure.[24] Plaintiffs first argue that a pattern and practice of discrimination exists because Defendants do not require all stylists to perform speciality services.  Plaintiffs argue that because African-Americans request speciality services more often than Caucasians, this policy has an indirect adverse impact on

_____

[24] In fact, some of the evidence Plaintiffs proffer is contrary to their position.  Plaintiffs attach what they purport to be a telephone log of discrimination complaints from 1999-2004.  As the court previously noted, this log actually highlights the diversity of complaints that Hair Cuttery receives and that there is no uniform or standard discriminatory policy or practice of any kind.  For example, on the first page alone, there are three allegations of *reverse* discrimination against Caucasians.  (Paper 36, ex. E).  *See also* (paper 36, exs. D, F) (evidencing wide factual variations in the declarations of other Hair Cuttery customers and a lack of any unified pattern or practice of discriminatory treatment).  Likewise, Plaintiffs' use of the complaint filed in the *Harris* case is not supportive because Judge Motz granted summary judgment to the defendant in that case, finding that the plaintiff failed to establish a § 1981 claim.  *Harris*, 2005 WL 2138128, at *3-4.

African-Americans.  As the court previously noted, this is not sufficient to establish a § 1981 claim, which addresses only *intentional* acts of discrimination (i.e., disparate treatment vs. disparate impact).

Second, Plaintiffs assert that Defendants use price surcharges as a pretext for discrimination.  This claim is not supported by any evidence other than Plaintiffs' conclusory statements that Defendants charge African-Americans more with an intent to dissuade them from seeking Hair Cuttery services.  On the contrary, the evidence shows that the amount charged for a service is related to how much time and effort is involved in that service.  (Paper 30, at 11, n.3) (detailing Hair Cuttery's fee structure).  To the extent that Plaintiffs are arguing that Hair Cuttery discriminates by charging higher prices for specialty services, which are used more often by African-American women, this claim fails because as noted, disparate impact claims are not recognized under § 1981.

Third, Plaintiffs argue that Defendants' failure to enforce Hair Cuttery's discrimination policy establishes a pattern and practice of discrimination.  Plaintiffs contend that contrary to Hair Cuttery policy, employees are not always immediately terminated after a discrimination complaint, but instead may

40

receive written or verbal warnings.[25]  Defendants' failure to terminate an employee immediately whenever any discrimination complaint is lodged is an insufficient basis upon which to establish a standard operating procedure of intentional discrimination.  At best, it proves that managers have autonomy to investigate complaints and determine what occurred, and that in some instances managers do not feel that immediate termination is warranted.  For example, Mr. Bach claimed he refused to serve Ms. Mercer because it was another stylist's "turn."  His account was supported by another stylist who was working at the time.  There is also evidence that Mr. Bach was uncomfortable performing the service Ms. Mercer requested.  The district leader placed Mr. Bach on probation instead of immediately terminating him, but when Mr. Bach refused to provide service on a subsequent occasion, he was immediately terminated.  (Paper 30, ex. 5, Deposition of Cathy Hall, at 24-32).

Finally, Plaintiffs argue that Defendants have a pattern and practice of discrimination because they incorrectly document

---

[25]  Hair Cuttery's policy states that refusal to provide service to any client results in immediate termination, subject to approval by a regional manager or Employee Relations.  (Paper 36, ex. L).  Plaintiffs concede that if a stylist continues to receive complaints after being written up, he or she would be fired.  (Paper 36, at 9).

discrimination complaints (e.g., by categorizing what are truly "race" complaints as based on something other than race). Plaintiffs claim that improper documentation fails to "ensure that rampant, company-wide discrimination, as alleged to have occurred in this case, does not continue." (Paper 36, at 9). Plaintiffs try to imply that Defendants, through their record-keeping procedures, remain purposefully blind to discrimination.[26] Plaintiffs first assert that if a customer calls the Hair Cuttery complaint hotline but does not allege race discrimination, the call is not categorized as a race discrimination claim.  What Plaintiffs fail to explain is how Defendants are supposed to know that the claim is *really* about race discrimination and document the call accordingly, if the customer never indicates race was a factor.  Plaintiffs also claim that because some customers complain to salon management directly, versus calling the complaint hotline, some complaints of racial discrimination may never be recorded within Defendants' centralized call-tracking system.  Plaintiffs do not contend that the complaint is not investigated or resolved, but

---

[26] Plaintiffs never directly explain how this act is tied to a pattern or practice of discrimination but because they must assert some form of intentional discrimination, the court assumes Plaintiffs are attempting to imply that Defendants willfully ignore or seek to avoid discrimination complaints as part of their alleged discriminatory standard operating procedure.

only that it is not recorded in the call tracking system.  This evidence is simply not sufficient to prove a pattern or practice of intentional discrimination.

Despite Plaintiffs' assertions, the evidence reveals quite the opposite of a standard operating procedure of intentional discrimination.  Defendants have a nondiscrimination policy that is posted in every store, stylists and management receive regular anti-discrimination training, and Defendants' managers are prompt in following up and investigating claims of discrimination, including the claims brought by Plaintiffs Clark and Mercer.  The evidence shows that stylists are disciplined, and, even though they may not immediately be terminated, multiple complaints will lead to termination.[27]  Moreover, both Ms. Clark and Ms. Mercer admit repeatedly patronizing Hair Cuttery salons because they received service without incident on multiple occasions, thereby negating any assertion that Hair Cuttery has a standard operating procedure of discrimination against African-Americans.  (Paper 30, ex. 1, Deposition of Monica Clark, at 39, 44-48, 124-27, ex. 8, Deposition of Leslie Mercer, at 64, 70-74).

**4.  Plaintiffs' Request for Discovery**

---

[27] For example, Mr. Bach was terminated after his second refusal to serve a customer.

Because Plaintiffs have not produced evidence sufficient to withstand summary judgment, it is necessary to address their claim that Defendants' motion for summary judgment should be denied as premature because Plaintiffs have not had sufficient discovery.  (Paper 36, at 14-15).  In their opposition memorandum, Plaintiffs claim that they have not had discovery relating to Defendants' alleged pattern or practice of discrimination and that they have filed a motion to compel discovery and extend the time for discovery due to "Defendants' refusal to provide discovery." (Paper 36, at 15).[28]  In their opposition memorandum, Plaintiffs argue that because Defendants had not (as of September 19, 2005, when the opposition memorandum was filed) provided any discovery related to the alleged pattern and practice of discrimination, Defendants' motion for summary judgment is "premature and should be denied because Plaintiffs have not had a full and fair opportunity to

---

[28] On September 29, 2005, Judge Connelly issued an order, (paper 41), granting Plaintiffs' motion for an extension of time (paper 33), which extended discovery until November 15, 2005. On October 7, 2005, Judge Connelly issued an Order, (paper 46), granting in part and denying in part Plaintiffs' motion to compel (paper 33), to which Plaintiffs have recently filed objections, (paper 56).  In light of the order compelling Defendants to supplement their discovery responses by October 24, 2005, Judge Connelly granted Plaintiffs' motion to enlarge the court's ruling on their previous motion for an extension of time, and extended discovery until December 12, 2005. (Paper 57).

perform an investigation in regard to this litigation." (Paper 36, at 15).

Generally speaking, "summary judgment must be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986); Fed.R.Civ.P. 56(f). "'Sufficient time for discovery is considered especially important when the relevant facts are exclusively in the control of the opposing party[,]'" and when a case involves complex factual questions about intent and motive. *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 247 (4th Cir. 2002), quoting 10A Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2741 at 241 (3rd ed. 1998).

A party opposing summary judgment may not merely assert in the opposition that discovery is necessary. Rather, the party must file an affidavit that "particularly specifies legitimate needs." *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995). An affidavit may not be absolutely necessary if the party makes objections that satisfy the purpose of providing an affidavit and is not lax in pursuing discovery, but "failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was

45

inadequate." *Harrods Ltd.*, 302 F.3d at 244-246, n.19. Moreover, as this court has noted, a request for discovery will not be granted if the party merely wishes to conduct a "fishing expedition" in search of evidence that may be helpful. *Morrow v. Farrell*, 187 F.Supp.2d 548, 551 (D.Md. 2002). In addition to the specificity requirement, a party must present reasons why it cannot put forth the necessary opposing evidence, *see Pine Ridge Coal Co. v. Local 8377, United Mine Workers of Am.*, 187 F.3d 415, 421-22 (4th Cir. 1999), and must establish that the desired evidence could be sufficient to create a genuine issue of material fact. *See McLaughlin v. Murphy*, 372 F.Supp.2d 465, 470 (D.Md. 2004). If a party meets this burden, "the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." Fed.R.Civ.P. 56(f).

Plaintiffs have not filed an affidavit specifying their discovery needs. Ignoring this deficiency, *see Harrods Ltd.*, 302 F.3d at 244, Plaintiffs have not particularly specified legitimate needs; instead they argue that they have not been able to "investigate" Defendants' alleged pattern and practice of discrimination. Plaintiffs' request is more akin to a fishing expedition in search of helpful evidence. This is

46

confirmed when examining Plaintiffs' broad discovery requests. In their motion to compel, Plaintiffs requested discovery of *all* discrimination complaints against Defendants in all Hair Cuttery locations nationwide within the past ten years. This request included customer and *employment* discrimination complaints, and encompassed every possible type of discrimination (e.g., discrimination based on age, disability, sex, national origin, etc.), even though this lawsuit relates only to racial discrimination against customers or potential customers.[29] (Paper 23, ex. A, at 9, Interrogatory no. 12). Moreover, a significant amount of discovery has already taken place in this case, including Defendants' supplemental responses to Plaintiffs' discovery requests, and yet Plaintiffs have failed to supplement their opposition memorandum with any evidence sufficient to show a "pattern and practice" of discrimination.[30] *See Adams v. Giant Food, Inc.*, 225 F.Supp.2d 600, 607 (D.Md.

---

[29] Judge Connelly has since narrowed the scope of discovery to include only complaints of customer discrimination brought in the past five years in Maryland, Virginia, and Delaware, the states where, according to the complaint, the alleged discrimination occurred. (Paper 46).

[30] In accordance with Judge Connelly's Order, Defendants' supplemental discovery responses pertained to all claims of racial discrimination by customers or potential customers in the past five years, at Hair Cuttery stores in Maryland, Virginia, and Delaware.

2002), quoting *Goodell v. Rehrig Int'l, Inc.*, 683 F.Supp. 1051, 1054 (E.D.Va. 1988) ("'[T]he mere hope that something might turn up in further discovery does not satisfy the standards of Rule 56(f).'"). Thus, the court will deny Plaintiffs' request to stay this decision.

## V. Plaintiffs' Other Motions and Objections

Also pending are: (1) Plaintiffs' motion to amend the complaint to add additional plaintiffs (paper 17); (2) Plaintiffs' motion for a preliminary injunction to stop the destruction of documents (paper 26); (3) Plaintiffs' objections to Magistrate Judge Connelly's October 7, 2005, Order (paper 56); and (4) Plaintiffs' motion to exceed ten depositions and forty hours of depositions (paper 51). Because the court will grant Defendants' summary judgment motion, these other motions will be denied as moot. The court's ruling on the summary judgment motion will render moot the objections to Judge Connelly's ruling.

**VI.  Conclusion**

For the reasons stated, the court will deny Plaintiffs'
motion for class certification, deny Defendants' motion to
strike Exhibit H, and grant summary judgment to Defendants.
Plaintiffs' other pending motions and objections will be denied
as moot.  A separate Order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge